FILED

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | |
|---|---|
| WARREN KATZ, acting pro se<br> Apt.1406 S, Boca Raton, Florida 33432.<br>1500 South Ocean Boulevard,<br>Tel. 561-416-2108-Cell 561-400-2920<br>e-mail-warkatz14@yahoo.com<br><br>   Plaintiff,<br><br>vs.<br><br><br>HOLLAND AND KNIGHT LLP.<br>1600 Tysons Boulevard Suite 700,<br>McLean, Virginia 22102<br><br>THOMAS M. BROWNELL, Esq.<br>1600 Tysons Boulevard Suite 700,<br>McLean, Virginia 22102<br><br><br>JOCELYN W. BRITTIN Esq.<br>1600 Tysons Boulevard Suite 700,<br>McLean, Virginia 22102.<br><br>Defendants, | Civil Action No. 1:09CV1106- TSE/IDD<br><br>Jury Trial Demanded |

## COMPLAINT FOR DAMAGES BASED ON

## NEGLIGENCE

## BREACH OF IMPLIED AND SPECIFIC CONTRACT TERMS

## AND BREACH OF DUTY AS AN AGENT

COMES NOW, The Plaintiff, Warren Katz, and for his claim of legal malpractice against

the law firm of Holland and Knight LLP., Thomas M. Brownell Esq. and Jocelyn W. Brittin

Esq., complains and alleges as follows:

## PARTIES TO THE SUIT

1.      This action is brought by Plaintiff Warren Katz, {"Katz"), who at all relevant times was the sole owner of Wrenn Associates Ltd., "Wrenn", which was a Virginia corporation, engaged in design/build developments.

2.      Defendant Holland & Knight LLP, ("HK"), is an international law firm with a branch office in McLean, Virginia. Katz and Wrenn were represented by the Defendant attorneys at this branch office.

3.      Defendant Thomas Brownell Esq., ("Brownell") was a partner in HK and was located in the aforementioned branch office at all relevant times.

4.      Defendant Jocelyn Brittin Esq. ("Brittin") was a partner in HK and was located in the aforementioned branch office at all relevant times.

5.      Non- party, Selwa Masri ("Masri") was an attorney at HK during all relevant times. It is believed that Masri is no longer employed at HK and is not, at this time, named as a Defendant in this suit.

### JURISDICTION AND VENUE

6.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1338(a) and 1331 based upon the underlying copyright infringement case in which the Defendants represented the Plaintiff.

7.      Venue is proper in this Court pursuant to the provisions of 28 U.S.C. §1400(a). . HK's representation of Katz and Wrenn commenced on June 12, 2003 and concluded on October 27, 2004

### PARTIES AND FACTS OF THE UNDERLYING CASE

8.      In 1995, Katz was completing a 91 unit project in Reston, Virginia that was a

mixture of patio homes and townhouses, ("Hemingway"). This was to be his last project prior to retirement. The project won a Northern Virginia Industry Home Builders Association design award.

9.      Early in 1995, Katz met with Warren Watkins, ("Watkins") and Sonja Nadeau, ("Nadeau"). Watkins managed Lake Manassas Limited Liability Company, ("LMLLC".) LMLLC developed and managed a residential development in Prince William County, Virginia known as Lake Manassas; ("LM").Watkins also owned Lake Manassas Real Estate Co., ("LMRE"). LMRE oversaw the marketing and sales of homes built at LM. Nadeau was LMRE's sales agent. Watkins and Nadeau were interested in having Katz replicate a twenty unit version of the Hemingway townhouses in LM. Because of his intention to retire, Katz declined the offer.

10.      Shortly thereafter, Watkins introduced Katz to a local custom home builder, Desmond Gatti, ("Gatti"), owner of Centaur Homes Inc. ("Centaur"). Gatti had neither built nor designed townhouses. Gatti and Katz ultimately joint ventured the LM project. Centaur was to purchase 20 lots on which a derivative plan of the Hemingway townhouses would be built. The plans were prepared by Wrenn's architect/employee Fernando Ortiz, ("Ortiz").

11.      Because Watkins wanted the elevations to be more traditional than the Reston derivative, Gatti hired Earth Design Associates, ("EDA") to perform this task. Barry Starke ("Starke") was the owner of EDA and Hardee Johnston ("Johnston") the architect/employee who did a rendering and elevational sketches

12.      Wrenn provided supervision and labor for the concrete and carpentry work at cost, provided computerized cost data, and assisted in creating marketing and sales materials. In addition, Katz provided financing.

13.      The LMLLC/Centaur land purchase agreement stipulated a purchase schedule of

3

five units at a time. Katz was to be paid $300,000 at the rate of $15,000 per unit at the settlement of each of the twenty townhouses to be built. After the sale of seven units, Gatti defaulted on his construction loan and his land loan. Katz was paid only $70,000 when Gatti defaulted.

14.     In order to salvage some portion of his equity in the project, Katz, then in a second position to LMLLC, paid off Gatti's land loan to LMLLC and completed the last three units in the first group of ten units. Katz offered to sell LMLLC the plans for the completion of the last ten units but negotiations turned sour and the plans were not sold. Katz notified LMLLC that they could not use the plans without compensation.

15.     After the completion and sale of the first ten lots, the remaining ten lots stayed vacant until 2001 when Quaker Homes Inc., ("Quaker") purchased the remaining ten lots and hired the Residential Design Group, ("RDG") to design the project. Leon McGlothlin, ("McGlothlin") was president of Quaker and Jay Brown, ("Brown") president of RDG.

16.     In August of 2001, Katz first saw the Quaker brochure and later the RDG plans, which instructed the builder to match several design details incorporated in the existing townhouses. The drawings also indicated that there were arrangements of elements nearly identical to the existing townhouses.

17.     Katz contacted Brown to discuss the similarity of the two designs and the references to matching prominent design elements. He told Katz that he received his instructions from McGlothlin and LMLLC. Brown also told Katz that he, McGlothlin and LMLLC representatives met with existing homeowners to present the RDG plans for their approval. The existing residents bought into the project with the premise that it would be a unified group of twenty homes. Brown said that the concerned residents were very pleased with his efforts to blend the two projects into one.

4

18.      Based on the RDG drawings and the conversation with Brown, Katz retained the law firm of Odin, Feldman & Pittleman, P.C., ("OFP"). The lawyer handling the case was Timothy McEvoy Esq., hereinafter, ("McEvoy"). McEvoy told Katz that he was involved in a copyright infringement case involving McGlothlin.

19.      On August 9, 2001, Katz met with McEvoy and another OFP attorney, Kevin Oliveira, ("Oliveira"). Oliveira's expertise was in copyright matters. In Oliveira's opinion, the Wrenn and RDG drawings were 70% similar.

20.      On August 10, 2001, Katz wrote to McEvoy expressing the need to register the appropriate plan. Wrenn had designed three different models while RDG designed only one model. His concern was that the plan RDG used, matched the model to be registered and the townhouses built by Centaur. The letter also conveyed Katz's belief that Starke had drawn exterior details for the existing townhouses. As Starke testified, Katz was mistaken.

21.      For about seven weeks, McEvoy did not respond to the letter and did not return Katz's calls. McEvoy eventually wrote Katz that he was too busy to accept the case at that time. The relationship with OFP was then terminated.

22.      Katz then contacted HK as a result of reading an article authored by HK attorneys, Brittin and Masri. The purpose of the article was to explain the meaning of derivative works and the importance of registering them in addition to the underlying work. An attorney- client relationship was established through an engagement letter dated June16, 2003 ("HK Contract"). A copy is attached as **Exhibit A.** The HK Contract was signed by Brittin on behalf of HK and by Katz on his own behalf.

23.      It expressly and specifically identified the obligations of HK's representation.
*"Our engagement will involve in assisting you with the protection and enforcement of your intellectual property rights in certain architectural and other drawings."*

24.      At the time the HK Contract was executed, Wrenn was dormant for six years.

25.     HK filed the underlying suit ("RDG suit") in the United States District Court for
the Eastern District of Virginia. The suit was settled on October 26, 2004 and is cited as
Civil Action No. 1.04-CV -354

26.     Defendants represented themselves, at all times, as competent and experienced
in the area of copyright law and knowledgeable in case law pertaining to copyright matters.

27.     Defendants were required to exercise the same legal skill as a reasonably
competent attorney and to use reasonable care in determining and implementing a proper
strategy to be followed to achieve the Plaintiff's legal goals as specified and promised
in the HK Contract.

28.     The Defendants were negligent, breached the HK Contract and breached their
duty as an agent. In October of 2008 Katz filed case number 1:08-cv-1137 ("HK suit")
against the Defendants. The suit was dismissed because, as pled, it was time barred. This
legal malpractice suit is brought within the five year statute of limitations.

### COUNT I

### NEGLIGENCE

29.     The preceding paragraphs are re-alleged as if set forth in full.

30.     But for the Defendants' negligence, lack of skill, lack of competence and failure
to exercise due diligence, Katz would have received a considerably greater settlement,
award or verdict.

31.     HK was negligent by failing to represent both Wrenn and Katz as clients,
negligent  by failing to name both Wrenn and  Katz as Plaintiffs in the RDG
suit and negligent by failing to name both Wrenn and Katz on the copyright registration.

32.     The key issue confronting the Court in the RDG suit was whether Katz was the
real party in interest to bring about a malpractice suit. The following evidence supports

6

Katz's claim that he is the real party in interest:

a.        ABA Formal Opinion 91-361 states that a lawyer who represents a company represents the company rather than the individuals in the company unless the specific circumstances show otherwise. The specific circumstances are that the HK Contract is with Katz expressly and with Wrenn impliedly.

b.        The HK Contract indicated that HK will represent a company or an official of the company, however, such representation required separate contracts. Only the aforesaid contract expressly naming Katz as the client was written

c.        The ABA Opinion also states that a claim of personal representation requires that the individual provide evidence of reliance of expectation of personal representation. The HK Contract speaks for itself and provides such evidence.

d.        Katz neither filed the RDG suit nor registered the copyright. Negligence law demands that persons with specialized skills superior to the ordinary person, use those skills with due care. Once Katz signed the HK Contract personally, he relied upon the Defendants to prepare all subsequent documents in a legal and proper way to afford him the personal protection and enforcement of his intellectual property as promised in the HK Contract.

e.        The HK invoices submitted to Katz identified Katz as the "Client" and the subject matter as "Copyright Protection & Enforcement" The invoices required the "Billing Attorney Signature". Therefore, HK lawyers signing the invoices, acknowledged Katz as their client. During its representation, HK never advised Katz that he was not their client.

f.        All HK invoices were submitted to Katz personally, and except for a small amount, all invoices were paid by Katz.

g.        It is well established under Virginia law that legal malpractice claims cannot be assigned. Katz, as HK's client, never assigned his right to that claim.

33.     The totality of HK's negligence must be considered in determining how HK exercised its duty of care in registering the copyright.

a.     HK was negligent in failing to submit photographs with the registration as emphasized in the Copyright Office instructions.

b.     HK was negligent in failing to register a derivative work along with the original drawings despite the following. On October 5, 2003, Brownell wrote, ***"Only the Centaur/Wrenn drawings have been registered with the Copyright Office......"*** He added, ***"..........but prudence dictates that we should register the Hemingway II drawings to ensure that their lack of registering does not become a major issue in any later litigation. If you can't come up with the drawings, themselves, the drawings from the advertising brochure might be enough".***

The article by Brittin and Masri warned of the same risk and cited examples of cases where the lack of subject matter jurisdiction resulted in the denial of the claim.

34.     Brownell was negligent in filing the suit using an incorrect Quaker company name although Katz provided him with the correct name, which also appeared on Quaker's contract. He also referred to McGlothlin as McLaughlin in court papers.

35.     Brownell was negligent in failing to petition the Court to require Defendants to produce compaction certifications done by Centaur for all twenty lots, which were given to Quaker by LMLLC. Several times Katz so instructed Brownell. LMLLC was unjustly enriched because it neither paid for the compaction nor the certifications.

36.     Brownell was negligent in misreading LM's Architectural Standards, interpreting them in favor of LMLLC, by erroneously claiming that Wrenn was merely complying with the Standards as was RDG.

37.     Brownell was negligent in failing to contact or depose Johnston. On August 8, 2006 Hardee Johnston responded to an e-mail sent to him by Katz as follows, ***"Mr. Katz: Most of our effort was directed to the site work and elevational studies. Earth Design did not generate the design or the drawings for the units, other than a porch or***

8

*two. All that Earth Design would have had was paper copies which I am sure would have been tossed out by now. All I kept is a copy of the cover of the brochure.* **[The rendering]** *Hardee Johnston"*

38.        Brownell was negligent in failing to exercise due diligence when investigating

copyright ownership. In August of 2003, Katz gave HK a copy of the aforementioned EDA

letter crediting them with making the exterior more traditional than the Reston derivative.

For the first time, on October 20, 2004, Brownell refers to this letter.. He wrote,
*"This document would be used against Wrenn in any summary judgment motion or at trial and would be very damaging, if not fatal, to the case."*

39.        Brownell negligently failed to name LMRE as a defendant although he knew that

LMRE's agent arranged for RDG to access an existing unit and provided them with a copy

of the brochure. In the HK suit, the Defendant's attorney referenced Katz's insistence on

adding LMRE to the suit as a client's improper instruction. The action of RDG proved

access and copying and established LMRE as contributory infringers. They received

$120,000 in commissions and profited from the infringement. Not naming a concurrent

wrongdoer who is factually liable, may be construed as legal malpractice.

40.        Brownell was negligent in the manner in which he conducted the depositions as

indicated by the following:

a.        Watkins admitted he had the brochure of the original townhouses.  The other

defendants testified that Watkins' agent supplied them with a copy of that brochure.

Brownell did not ask Watkins to confirm or deny their testimony.

b.        Watkins said he didn't know who did the architectural plans for Centaur.

Brownell had a copy of a previous deposition in which Watkins indicated he knew that

Wrenn did the plans. Furthermore, Watkins had to see the Hemingway plans in order to

instruct Quaker to make it more traditional.

c.        Brownell showed Watkins the site plan submitted by LMLLC for the Wrenn

designed townhouses. Brownell did not ask Watkins if a revised plan showing the Quaker townhouses was submitted as required by the County. Katz checked with the County and found out that a revised site plan was not submitted.

d.. Watkins testified that Centaur did not prepare the lots. Brownell had a copy of the LMLLC-Centaur contract, which required Centaur to fine grade and compact the twenty lots. Brownell did not challenge Watkins' statement.

e. Brown admitted he inspected an existing unit because LMLLC wanted *"to establish the level of finish so that the Quaker Homes units would have the same features from a marketing point of view as the original units."*

Brownell neither pursued this with Brown from the standpoint of intentional copying, nor did he ask Watkins whether he gave Brown such an instruction.

f. Brown testified that establishing a level of finish was not his responsibility. Brownell did not ask him, if that were the case, why he was selected to make the inspection. Obviously, Brown's inspection of the existing townhouse was a ploy to view the interior details and design of those units. Katz called this to Brownell's attention expecting him to question McGlothlin or Watkins on this matter. Brownell did not.

g. The Quaker brochure designated the existing townhouses as "sold", falsely implying that they were built and sold by Quaker. These units were sold five years earlier. Brochures depicting adjacent properties, not built by the same builder, would be properly shown as "existing", unless it was the intent to deceive the potential purchaser. Brownell did not ask if this were part of the scheme to make it appear that one builder built the entire project at one time.

h. The two story box bay window dominated the front elevation of the Wrenn design. RDG provided no details for this element, yet it was incorporated in the Quaker townhouses. When Brownell asked Brown how a builder was supposed to build something

10

when details were lacking, he was told to ask the builder. Brownell did not ask McGlothlin about this in a subsequent deposition.

i.         Brown testified he was instructed to design a three bedroom unit with a recreation room in the basement. However, what RDG designed was a fourth bedroom in the basement and an adjacent full bath with access from both the bedroom and the recreation room. The bedroom closet was recessed and backed up to the mechanical room, providing a noise buffer. This layout was exactly what Brown saw when he inspected an existing end unit. Brownell ignored this discrepancy.

j.         McGlothlin testified that, prior to purchasing the second group of lots he visited Gatti at the townhouse which served as a model and sales office where brochures were given out. Brownell never asked McGlothlin the purpose of the meeting, what was discussed or if he took a brochure.

k.         RDG's invoice to Quaker indicates that the entire design was developed by December 15, 2000 at a total cost of $2,170. Brown testified that his inspection of the existing unit took place in early December 2000. Brownell did not question Brown as to the extremely low cost or the "coincidental" timing of the design, which was created right after his inspection of an existing unit.

l.         Brownell was negligent in failing to dispute Watkins' contention that he had not seen the original plans. He had in his possession a letter written by Watkins to Gatti dated April 10, 1995. It said, ***"We have reviewed your town home plans and are comfortable with the general product being built to confirm our moving forward with the sale agreement. Once the finished plans are available, they should be submitted to the NCC."***

41.         On September 15, 2003 Masri acknowledged receipt of Katz's claims against OFP. She indicated that she was reviewing the matter internally and would get back to Katz shortly. She never did.

11

42.     By reason of the foregoing negligence, the Defendants breached their duties to the Plaintiff, which directly and proximately caused damages to the Plaintiff. Therefore, the Plaintiff is entitled to recover its damages from the Defendants.

43.     Wherefore, Plaintiff demands judgment against Defendants, and each one of them, for a sum in excess of $2,500,000, to be proven at trial, plus costs, interest from October 27, 2004, attorney's fees and such other and further relief including punitive damages as the Court deems just and proper.

## COUNT II

## BREACH OF CONTRACT

44.     The preceding paragraphs are re-alleged as if set forth in full.

45.     Brownell breached the HK Contract by threatening to discontinue representation unless Katz increased the agreed upon retainer.

a.      The HK Contract, stipulated that, *"We will bill actual hours spent on the project and invoice monthly. Our invoices are due within thirty days from the invoice date".*

It also required a $1,000 retainer, which was paid by Katz and returned to Katz at the conclusion of the case.

b.      On December 5, 2003, Brownell wrote, *"Before we agree to file suit on your behalf, we would require the retainer to be increased to $50,000."*

c.      On March 26, 2004, Brownell wrote, *"If you want to go forward, we will need to bring your retainer balance up to $50,000, as per our previous letter. We currently are holding $14,343.44 in trust. I look forward to hearing from you."*

Only four days later, on March 30, 2004, he asked for another $35,000.

d.      On July 28, Brownell wrote, *"Finally, we will require that the $50,000 retainer be replenished. Please contact me to discuss specifics."*

(Emphasis original.) All of the letters were copied to Brittin.

e.      Brownell's highly reprehensible threats go well beyond a breach of contract,

12

It is incomprehensible that any lawyer would deny his client continuing representation
unless the client provided funds well in excess of his contractual obligation. The Plaintiff,
asks the Court to award punitive damages in the maximum amount of $350,000 allowable
by Virginia law. Katz agreed to the retainer increase, because as he wrote Brittin, he was a
Florida resident and it would be extremely difficult to start over again with a Virginia firm.

f.        Brownell acted in conscious disregard of Katz's right to due process and with
reckless indifference to the consequences Katz would face had he been forced to obtain new
representation after having made timely payments to HK. Brownell was aware of the terms
of the HK Contract and the oppressive nature of his demands and threats he made. See
*Giant of Virginia v. Pigg*, 207 Va. 679, 152 S.E. 2d 271 (1967)    *459 F2d 19 Sperry*
*Rand Corporation v. A-T-O Inc,* 593 F2d ,   593 F2d 559 National Carloading
Corporation v. Astro Van Lines Inc.

46.       The HK Contract specifies that Brittin and Masri will do much of the work. In
fact, they did very little work on the case. Brownell's name was not mentioned but his rate
was $120 per hour more than Masri's rate. Katz never got an explanation for the change.

47       Brownell breached his Contract with Katz by misrepresentation and duress in an
effort to avoid litigating against LMLLC's law firm as follows:

a.        On December 5, 2003, Brownell wrote, *"I am unsure whether you have a case
against LM or the realtor. They may have required the builder to match the existing
structure, but that did not preclude Quaker from making appropriate arrangements with
you to obtain a license to use the drawings or copy the construction."*

Anyone requiring a builder to match an existing structure designed by another architect, is
a contributory infringer. Copyright law reaches beyond the direct infringer in the same way
criminal law prosecutes those aiding or abetting a crime.

b.        On March 30, 2004, Brownell wrote, *"I recommended that we consider a
tactical decision not to sue Lake Manassas, based on its secondary liability and the past*

*bad blood between the two of you. You stated that you wished to proceed against that company anyway."*

Secondary liability represents a clear and compelling reason to sue under the framework of

copyright law. In this instance, LMLLC was the controlling party behind the infringement

and benefited considerably more than RDG, the direct infringer.

c.        On May 4, 2004, Brownell wrote the following to Katz, *"I also recommend that we consider a separate settlement with that company."* [LMLLC]

d.        Also on May 4, 2004, Brownell wrote, *"Please see the attached letter discussing your quasi contract theory. In my view, you did not have a contract, express or implied, with Lake Manassas, with regard to the plans. To the extent you have a contract, by virtue of your participation in the Gatti deal, you [Katz] were required to assign the plans to Lake Manassas."*

This is an egregious statement considering that Brownell was representing Katz in a

copyright infringement claim against the party who Brownell contends had a right to the

plans. If Katz were required to assign the plans to LMLLC, they had a right to provide them

to Quaker and easily defeat an infringement claim that Brownell agreed to pursue. None of

the Defendants made such a claim, which would have been their first line of defense.

e.        The requirement for Centaur to assign the plans to LMLLC was a condition

precedent for providing additional financing to Centaur. LMLLC did not enforce this

provision and, therefore, waived their rights to the plans. A bilateral contract cannot

obligate a third party without that party's consent. Katz never agreed to assign the plans,.

f.        On May 15, 2004, Brownell wrote, *"You do have a potential copyright claim against LMLLC. That claim is greatly weakened, however, if LMLLC did not actually provide any drawings to Quaker."*

Whether or not it can be proven that LMLLC provided Wrenn's drawings to Quaker does

not greatly weaken the case. Brownell knew that LMRE's agent provided Quaker with a

brochure, which depicted the interior floor plan that was shown on the architectural plans.

She also arranged for Brown to inspect the interior of an existing end unit.

14

g.      In the same letter, he wrote the following *"In sum, your claim against LMLLC is fairly weak. — I advise you in the strongest possible terms to try to settle this claim with LMLLC now.* (Underlining original) This represents an oppressively forced settlement.

h.      On May 17, 2004, Brownell wrote, *"We are wasting time and your money debating this. Please give me a call sometime today to discuss a proposal to settle the LMLP case."*

In cases where defendants are jointly and severally liable it is essential to have at least one

deep pocket party as a defendant. That defendant was LMLLC.

i.      In the same letter Brownell also wrote, *"In addition, as we have discussed, they [LMLLC] are well financed and, with the past bad blood between you, if forced, they may put up a big fight."*

 If litigating against a well financed party that may put up a big fight concerned HK, they

should never have taken the case. Brownell's reference to LMLLC's financial strength

reveals that Brownell's advice not to sue LMLLC stemmed from Brownell's concerns

regarding his ability to oppose LMLLC's counsel in copyright infringement litigation.

j.      Brownell reluctantly included LMLLC in the suit but badgered Katz into

allowing him to propose a settlement solely with LMLLC. On May 17, 2004, Katz wrote, *"Tom you've beaten me down. Give Sullivan whatever you want.... $40,000 $28,000$2,000. This is your authorization. We don't have to talk."*

Those extremely low figures were previously proposed by Brownell. Katz agreed because

he couldn't put up with Brownell's constant badgering and his defense of LMLLC, which

was counter to his duty of loyalty to Katz. Brownell's proposal was rejected by LMLLC.

k.      Brownell also writes, *"For the same reason, it probably would not be inequitable in view of Centaur's default, to retain the design. Indeed, Centaur expressly promised to assign that design to LMLLC".*

The LMLLC-Centaur contract provided, *"In the event of default by Purchaser of any of its obligations pursuant to this Agreement, Seller shall have the right, as its sole and exclusive remedy, to retain the Deposit as fixed and liquidated damages for such default by Purchaser, and not as a penalty. In no event shall Purchaser be liable to Seller for damages for any such default beyond the Deposit."*

It is absolutely untrue that Centaur expressly promised to assign the design to LMLLC., because Centaur never owned the design. LMLLC kept the deposit and was entitled to no more. Here again, Brownell, the Plaintiff's attorney, acts as the defendant's attorney, in the RDG suit, by claiming a defense for the defendants they never claimed on their own behalf.

48.     Brownell breached the HK Contract through duress and misrepresentation in order to induce and force Katz to settle with the defendants in the RDG suit.

a.      Under Virginia law, duress exists *"Whenever one party exerts pressure on another which induces the other to enter into a contract or otherwise act under circumstances which deprive the person pressured of the exercise of free will."*

**Azalea Drive-In Theater, Inc. v. Sargoy, 395 F.Supp. 568, 574 (E.D.Va.1975).** Also see **Bond v. Crawford, 69 S.E.2d 470 (Va.1952** which held that threats render a contractual agreement involuntary.

b.      Under Virginia law, settlement agreements are treated as contracts subject to the general principles of contract interpretation. See **Bangor-Punta Operations, Inc. v. Atlantic Leasing, Ltd., 215 Va. 180, 207 S.E.2d 858, 860 (1974),** and **Byrum v. *Bear Investment* Co. 936 F.2d 173, 175 (4th Cir.1991)**. The breach of the settlement agreement, attached as **Exhibit B**, therefore, constitutes a second breach of contract.

c.      Brownell threatened that, if Katz did not settle, there would be substantial additional costs, which would not increase the chance of prevailing. He further threatened there was a good likelihood the defendants would be granted summary judgment.

d.      Summary judgment has been disfavored in cases involving intellectual property.

See **Twentieth Century-Fox Film Corporation v. MCA, Inc., 715 F.2d 1327, 1330 n. 6 (9th Cir.1983**. On December 5, 2003, Brownell wrote, *"[I]t is pretty clear that a reasonable jury could find that there is an "overall impression" that the Quaker Homes townhomes are "substantially similar" to the Centaur-Wrenn drawings."*

Obviously, Brownell motives are to end his representation through misrepresentation.

49.     When Katz received HK's file on the case he found that Brownell deliberately concealed and misrepresented case law that was beneficial to Katz's claim.

a.      The Courts have adopted a two prong test to determine ownership; the intent of the parties at the time the work was created; and whether the work was copyrightable. Both conditions have to be met to establish sole ownership or joint ownership.

b.      On October 4, 2004, Brownell wrote, *"Barry Starke of Earth Design said his company is a landscape architecture firm. He doesn't recall any work on the facades/elevations for the townhouses, although he couldn't say for sure that there weren't others at his company working on it."*

c.      Starke, at his deposition, testified that he was not aware of any design work performed by his firm for the townhouse project other than some sketches and a rendering, which he described as an *"artistically enhanced drawing for presentation purposes."* He said that he had no relationship with Wrenn and no agreement as to the ownership of the work. Therefore, Brownell knew that Starke had no intention of being a co-owner of a work that he could not recall being done.

d.      Under section 101 of Title 17 of the US Code, a joint work exists if the authors collaborated with each other with the knowledge and intent that the contribution of both parties be merged into *"inseparable parts of a unitary whole."* There was no collaboration between Wrenn and EDA. There was never an intention, by either party, at any time, to co-author a work of any sort.

e.      On October 12, 2004, Brownell wrote, *"As I told you yesterday, there are full-size drawings that show elevations of the townhouses that are virtually identical to the rendering also done by Earth Design for the brochure."*

One full size drawing was the rendering, which was enhanced and reduced to serve as the cover of the brochure. The rest were sketches of ideas and were not copyrightable.

f.      On October 20, 2004, Brownell wrote, *"The issue is not Earth Design. It is Wrenn. The fact that Earth Design and Centaur both apparently contributed substantial*

*elements of the final design makes it difficult if not impossible to sustain your burden of proof."*

 Wrenn's drawings were the only copyrighted work. It was the burden of EDA and Centaur

to claim ownership had they felt it was a valid claim However, neither sought, nor pursued

ownership of any portion of the design. Those claims were made by third party infringers

and vigorously supported by Brownell. Moreover, Brownell did not cite a single element

that Centaur contributed to the final design, much less a substantial number of them. At the

outset of their engagement, HK was furnished with numerous letters and sketches, which

indicated that Centaur relied upon Katz for architectural design.

g..            . Brownell obtained an EDA sketch, which suggests modifications to certain

components of the existing design. Components that are modified already exist and do not

owe their origin to those suggesting the modification. EDA's contribution of a rendering

and some conceptual sketches, were far less significant than those provided by other

professionals involved in the home building process.  It is not the aim of copyright law to

expand the benefits of contributors to the detriment of creativity by fragmenting copyright

into equal sections of a pie.

h.            Starke testified that the total cost of the work performed by EDA was only

$1,038. If Starke were considered to have co-authored the design, copyright law grants him

equal rights and benefits to those of Katz regardless of the minimal contribution.

 In *Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1068 (7th Cir. 1994),* the court

expressed this concern, *"Even a person whose contribution is relatively minor, if accorded joint authorship status, enjoys a significant benefit".*

 In *Respect Inc. v. Committee on the Status of, Women, 815 F. Supp. 1112, 1119 (N.D. Ill. 1993)*the Court expressed a similar concern, *"Crediting a minor contributor with joint-authorship status confers substantially greater benefits than the relative amount of his or her effort because joint authors hold equal interests".*

i.   On October 18, 2004, Brownell referred to 17 USC §410(c) and wrote, ***"This presents a major problem for your case since the plaintiff must prove that it is the legal owner of the copyright and any presumption to that effect is gone since the copyright was registered too long after creation."*** [More than five years]

Brownell deliberately ignores the last sentence, which allows the Court to consider the evidentiary weight of the claim. In March of 2004, he found no problem on this issue. In October of 2004, he declares it to be a "major problem". When HK took the case they knew that the copyright was registered more than five years after it was created, nevertheless, they took the case on its merits.

j.   On October 20, 2004, Brownell wrote, ***"The fact that the Earth Design drawings were "conceptual" and "un-dimensioned" is of no significance-the issue is whether they look like what was built."***

The brochure cover looks like what was built, because Johnston was given the architectural drawings from which he created the rendering. Brownell knew that the LM project was a derivative of Hemingway, which was designed and built about five years before Johnston did the rendering. The HK file contained ***<u>Rottlund Co. v. Pinnacle Corp., 2004 WL 1879983 at 24 (D. Minn. 2004). 507 (2d Cir. 1991</u>***  The Rottlund Court rejected the defendant's claim of authorship when it ruled, ***"How these and other ideas would be expressed or realized in a finished plan is not even approached in Plaintiff's drawings."***

k.   As previously indicated, Brownell claimed that Katz's case was greatly weakened without direct evidence of infringement. A plaintiff in a copyright infringement case need not produce evidence catching the defendants "red-handed." Copyright law makes no distinction between the weight or value to be given to either direct or circumstantial evidence.

l. In ***<u>Dawson v. Hinshaw Music 905 F. 2d 731 (4th Cir. 1990)</u>***, the court noted that, ***"[B]ecause of the difficulties in proving copyright infringement by direct evidence, plaintiffs can establish a prima facie case of infringement by showing possession of a valid copyright, the defendant's access to the plaintiff's work, and substantial similarity between the plaintiff's and defendant's works."***

***Towler v. Sayles, 76 F.3d 579, 581 (4th Cir. 1996)***, addresses proof of infringement:

 *"As is typically the case, the Court finds that the plaintiff has failed to offer sufficient evidence of direct copying. Nonetheless, the plaintiff may raise a presumption of copying by proving through circumstantial evidence, (1) that the defendants had access to the copyrighted work and (2) that the alleged copy is substantially similar to the original work."*

50.    Brownell also intentionally concealed and misrepresented case law researched by

other lawyers in the firm that would benefited Katz's claim.

a..    On March 26, 2004, Brownell related a meeting he had with an architect to

whom he showed the RDG and Wrenn drawings. *"He also stated that while there are many similarities (up to 50%) there are also many differences. In addition, many of the similarities are simply rearranging of details......."*

Brownell uses this opinion to persuade Katz that he has "less than a 50 %"chance of

prevailing. However, the opinions expressed are contrary to copyright law. First, an

architect's opinion with respect to similarity is rejected by the courts. Similarity is

determined by the overall impression of the casual observer; a determination already made

by the existing owners. Second, differences are not a prime factor in determining

infringement. It is simple to take a creator's expression of a work and add something to

mask the infringement. This is what RDG did at the direction of LMLLC. Third,

development housing design is constricted by the use of standard elements. It is the

independently created arrangement of common elements that is protected from copying.

c.    In **Mattel, Inc., v. Goldberger  US Court of Appeals - 365 F.3d 133,** the

opinion of the court indicates that the architect's opinion has no basis in copyright law.

*"The proposition that standard or common features are not protected is inconsistent with copyright law. To merit protection from copying, a work need not be particularly novel or unusual. It need only have been "independently created" by the author and possess "some minimal degree of creativity." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)."*

*"Nor can one who copies portions of a work protected by copyright escape liability by changing other portions. See Nat'l Comics Publ'ns, Inc. v. Fawcett Publ'ns, Inc., 191 F.2d 594, 603 (2d Cir.1951) (L. Hand, J.) ("Defendant) appears to suppose that, because its [version] differed from [plaintiff's] in essential details of plot and in general pattern, it did not infringe. Nothing could be more mistaken; a plagiarist can never excuse his wrong by showing how much he did not plagiarize.")."*

The Mattel case was researched by Masri and deliberately withheld from Katz.

c       Brownell refused to add an unjust enrichment claim to the suit as Katz urged him

to do. On May 4, 2004, Brownell writes that the value of a quasi contract is *"far less than*

*you would otherwise be able to recover in copyright infringement damages."*

This reveals Brownell's lack of understanding of equivalency and preemption. Paragraph

301 of Title 17 of the US Code reads *"Nothing in paragraph (1) annuls or limits any rights or remedies under the common law or statutes of any State with respect to activities violating legal or equitable rights that are not equivalent to any of the rights conferred by section 106A with respect to works of visual art."*

d..      The unjust enrichment claim was not related to infringement. It was based on (1)

the preliminary site plan prepared by Gatti and Katz for all twenty lots with final house

sitings to be provided to LMLLC, which they would give to their engineer for submission

to the county; (2) the processing and coordination of underground utilities; (3) the fine

grading, compaction and certification of all twenty lots. LMLLC benefited and was unjustly

enriched from the work paid for by Katz.

e .       In the Virginia case of ***Microstrategy, Inc., v. Netsolve, Inc., No. 05-334 (E. D. Va. May 13, 2005),*** the Court held, *"Nevertheless, an unjust enrichment claim may survive a preemption challenge if plaintiffs demonstrate that defendants were unjustly enriched by material beyond copyright protection."*

f.       Katz contended that the damages recoverable would be the value of the benefit

conferred upon LMLLC, not the fair market value of the work performed, as Brownell

persistently alleged.

g.        HK's file contained a June 1, 2004 e-mail sent to another HK attorney, Brian Elledge, asking him, to research the issues of quasi contracts. He wrote, *"The issue is what*

*are the elements of a quasi contract claim in Virginia and what is the measure of damages in the event the Court finds such a claim."*

h.      On June 2, 2004, Katz received an e-mail from Brownell in which he cites only

one case, Wright v Cangiano, indicating that it was a case researched by Elledge. However,

the HK file included the Elledge response, which cited five cases none of which was

Wright. The focus of Elledge's research was Crippen v. Pet Farm. Elledge writes,

 *"As the excerpt below from Pet Farm shows, the damages for a quasi contract claim -- the value of the benefit can be more than those recoverable under an express contract or an implied-in fact-contract -- "reasonable value of services provided."*

Elledge's response substantiates Katz's contention that quasi contract would have been a

meritorious claim. Brownell refused to add the claim to the suit.

i.      Brownell also wrote, *"LMLLC did not actually use the site plan -- Quaker did. Quaker, not LMLLC, thus benefited from the plan."*

The benefits were conferred five years before Quaker purchased the property. The price

Quaker paid reflected whatever existed at the time of the purchase. LMLLC sold the second

ten lots to Quaker with the understanding that it could use the existing preliminary site plan.

j.      On July 28, 2004, Brownell Quaker's document. He wrote, *"You will be interested to know that there were revised site plans for the townhomes prepared by Dewberry"*

They turned out to  be wall checks required by lenders to establish "as built" conditions.

They did not remotely resemble site plans.

51      Brownell breached the HK contract by intentionally concealing cases where

courts denied co-ownership to claimants who did not establish an intention by both parties

to share ownership or where the claimant did not contribute copyrightable material.

52.      The following cases were either in HK's file or are well established cases that

experienced copyright lawyers should have been familiar with:

 *Fred Riley v. Cosgrove, 885 F. Supp. 1478 (U.S. Dist. Kan. 1995*   The Riley Court held, *"Co-authorship requires an agreement or intent by the parties who claim co-authorship,*

*to be co-authors at the time the copyrightable work was created. One may not become a co-author of a derivative work by default without the knowledge, consent and agreement of the other alleged co-author. There is no evidence of such or agreement."*

### *Childress v. Taylor, 945 F.2d  500, 507 (2d Cir. 1991)*

*"We need not determine whether we agree that Taylor's contributions were not independently copyrightable since, even if they were protectable as expression or as an original selection of facts, we agree that there is no evidence from which a trier could infer that Childress had the state of mind required for joint ownership." "More important, the prevailing view strikes an appropriate balance in the domains of copyright and contract law. In the absence of contract, the copyright remains with the one or more persons who created copyrighted material."*

### *Aalmuhammed v. Lee, 202 F.3d 1227 (9th Cir. 2000)*

*"Progress would be retarded rather than promoted, if an author could not consult with others and adopt their useful suggestions without sacrificing sole ownership of the work. Too open a definition of author would compel authors to insulate themselves and maintain ignorance of contributions others might make."*

### *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 73 F. Supp. 165*

*(S.D. N.Y)*   The Court ruled that the test is the consent of whoever holds the copyright on the first author's product at the time of the collaboration and whether the resulting work is to be found an "indivisible product," depending on the intent each had in mind in respect to his share of the unitary whole.

### *Berman v. Johnson, (Ellis, J.) No. 1:07cv39, Oct. 19, 2007; USDC at*

*Alexandria, Va.,*  This is a case held in the same Court under which the underlying case was filed. The Berman jury was instructed to find, by a preponderance of the evidence, whether the plaintiff and the defendant were joint owners of a particular work product. In making this determination the jury was instructed to consider whether there was an intention by the parties to be joint authors and whether the contribution to the work was independently copyrightable.

53.      Katz relied upon Brownell's support of the defendant's bogus claim that the

EDA contribution invalidated his rights in his intellectual property and as a result agreed to

a  settlement he otherwise would have rejected.

54.      By reason of the foregoing, the Defendants breached their contract with Katz,

which directly and proximately caused damages to Katz. Therefore, Katz is entitled to

recover those damages from the Defendants.

55.      Wherefore, Katz demands judgment against Defendants, and each one of them,

for a sum in excess of $2,500,000, to be proven at trial, plus costs, interest from October 27,

2004 and attorney's fees and such other and further relief as the Court deems just and

proper including punitive damages.

## COUNT III

## BREACH OF DUTIES OF AN AGENT

56       The preceding paragraphs are re-alleged as if set forth in full.

57,      At all relevant times hereto the Defendants, as Katz's agents, failed in their duty

of loyalty to Katz .The facts of the case clearly describe Brownell's actions in advocacy of

the defendant's position. He even initiated defenses that they did not claim on their own

behalf. LMLLC did not claim ownership rights to the drawings, but Brownell stated that

they had such rights. EDA did not claim ownership rights to the drawings, but Brownell

stated that they had such rights.

58.      Brown testified that he was instructed by Watkins to copy various elements of the

existing townhouses so that the entire project appears as if it were built by one builder. In

order to do so Quaker had to build homes substantially similar to the existing units.

Brownell asked McGlothlin if he and Brown discussed the need to obtain the consent of the

previous architect or builder in order to comply with Watkins' directive, McGlothlin,

testified, *"Lake Manassas has certain standards, and I think__ you know, I don't question when they tell me I have to do something. You know, we just do it."*

59.      Brownell ignored these admissions of willful copying and infringement and forced Katz to settle for $10,000 although Brownell examined Quaker's records and determined their profits to be $766, 568. Not included are the profits of LMLLP, RDG or LMRE or anything related to unjust enrichment or other potential claims. Copyright law entitles the copyright owner to recover the profits of the infringers and actual damages.

60.      As Katz's agent, Brownell had a duty of loyalty to Katz to maximize the recovery for damages incurred by the defendant's infringement. The duty of loyalty is a greater duty than the duty of care. Loyalty includes following Katz's instructions. Brownell refused to add the meritorious claim of unjust enrichment and the meritorious claim of contributory infringement against LMRE.

61.      By reason of the foregoing, the Defendants breached their duties as an agent to the Plaintiff, which directly and proximately caused damages to the Plaintiff. Therefore, the Plaintiff is entitled to recover its damages from the Defendants.

65      Wherefore, Plaintiff demands judgment against Defendants, and each one of them, for a sum in excess of $2,500,000, to be proven at trial, plus costs, interest from October 27, 2004 and attorney's fees and such other and further relief as the Court deems just and proper. In addition the Plaintiff is asking the Court to award $350,000 in punitive damages as a deterrent to highly reprehensible conduct.

## SUMMARY

.           This is not the case of a disgruntled client who had a sudden awakening that he should have settled for more money. It was a rude awakening that Katz received when he read the HK file containing cases that clearly rejected the claim that EDA's contribution to

the design of the project was fatal to the case. This was the primary basis upon which Katz agreed to settle the case.

In addition, there were other documents that were beneficial to Katz's claim of copyright infringement and unjust enrichment. Brownell's objective was to undermine Katz's meritorious claims on those issues thereby breaching the promises made to Katz by HK under the terms of the HK Contract.

This Court, in the RDG suit, made Katz's standing to sue, the threshold issue. The contractual relationship between HK and Katz was not unlike any other contract subject to contract law. The contract specified what HK would do for Katz and Katz agreed to pay for the services promised. No corporation was mentioned in the HK Contract and Katz is not suing on behalf of a corporation. Brownell egregiously demanded money from Katz to continue his representation, breaching the terms of the HK Contract. He made no such demand of a corporation. For the reasons previously mentioned, Katz acceded to the demands and made payments from personal funds.

Under *Abramson v. Wildman*, 2009 WL 250615 (Md. App. 2009), the court held that one can allege legal malpractice in a breach of contract claim if the engagement letter contains express representations regarding the work that the lawyer will do. Katz has a constitutional right to represent himself.

Respectfully Submitted,

Warren Katz, Acting Pro Se.

10/01/09